**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MARIA MIKOLCHAK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | |
| Plaintiff, | |
| vs. | **CIVIL ACTION NO.**  3:17-cv-00923 |
| | **JURY TRIAL DEMANDED** |
| SIGNET JEWELERS LIMITED, MARK S. LIGHT AND MICHAEL BARNES, | |
| Defendants. | |

<u>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF**</u>
<u>**THE FEDERAL SECURITIES LAWS**</u>

Plaintiff Maria Mikolchak ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Signet Jewelers Limited ("Signet" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Signet from August 29, 2013 through February 27, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as Signet maintains a Corporate and Distribution facility in Irving, Texas

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Signet securities at artificially inflated prices during the Class Period and was economically damaged thereby.

7.      Defendant Signet engages in the retail sale of diamond jewelry, watches, and other products in the United States, Canada, Puerto Rico, the United Kingdom, the Republic of Ireland, and the Channel Islands. Signet is incorporated in Bermuda and its principal executive offices are located at Clarendon House, 2 Church Street, Hamilton HM11, Bermuda. Signet common stock trades on the New York Stock Exchange ("NYSE") under the ticker "SIG."

8.      Defendant Mark S. Light ("Light") has been the Chief Executive Officer ("CEO") of Signet since November 1, 2014. Defendant Light was previously President and Chief Operating Officer ("COO") of Signet and CEO of the Sterling division since 2006.

9.      Defendant Michael Barnes ("Barnes") served as the CEO of Signet from January 30, 2011 until October 31, 2014.

10.      Defendants Light and Barnes are collectively referred to herein as the "Individual Defendants."

11.      Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

12.      Signet is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.      The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Signet under *respondeat superior* and agency principles.

14.      Defendants Signet and Individual Defendants are collectively referred to herein as "Defendants."

### SUBSTANTIVE ALLEGATIONS

#### Background

15.      The Company's segments are the Sterling division, the UK Jewelry division, the Zale division, which consists of Zale Jewelry and Piercing Pagoda, and the Other segment. The Sterling division operates approximately 1,540 stores. Its stores operate nationally in malls and off-mall locations as Kay, and regionally under various mall-based brands.

16.      On March 18, 2008, 15 current and former female employees filed a class action complaint against Signet's Sterling division, styled *Jock, et al. v. Sterling Jewelers, Inc.*, No.

1:08-cv-02875-JSR (S.D.N.Y. filed Mar. 18, 2008). The *Jock* plaintiffs brought the class action "to challenge a pattern and practice of sex discrimination in promotion and compensation committed against current and former female employees by Sterling Jewelers, Inc." *Id.*, Dkt. No. 1 at 1. Plaintiffs alleged violations of Title VII of the Civil Rights Act ("Title VII") for disparate impact and disparate treatment, violations of the Equal Pay Act ("EPA"), and violations of the Age Discrimination in Employment Act on behalf of two named plaintiffs. *See id.* at 38-41.

17.     On June 18, 2008, the Honorable Jed S. Rakoff, District Judge, referred the *Jock* case to arbitration and stayed the litigation pending completion of the arbitration. Thereafter, plaintiffs proceeded with their claims before the American Arbitration Association ("AAA") Employment and Class Action Tribunal, the Honorable Kathleen A. Roberts (Ret.), presiding.

18.     On June 21, 2013, plaintiffs submitted their motion for class certification in the arbitration. Among the exhibits to their class certification motion were the Declarations submitted under seal by current and former female and male employees, spanning over 1,300 pages of evidence that included strikingly similar allegations of sexual harassment, including sexual assault. Approximately half of the Declarations, over 100 employees, provided sworn testimony about sexual misconduct implicating executives and top managers of the Company. The Declarations were provided to the arbitrator and the defense, but they were not made available to the public until February 26, 2017.[1]

19.     The arbitration has largely been conducted in private and the Company has disclosed little about what went on in those proceedings over the past nine years.

---

[1] Even now, the names of the alleged perpetrators remain redacted in the Declarations, with only the categorical position of the perpetrator, such as "Executive(s)," typed in red over the redacted text. Moreover, the class certification brief, now available to the public in part, remains heavily redacted, including all seven pages that follow the heading, "Conduct of Executives."

**Materially False and Misleading**
**Statements Issued During the Class Period**

20.     On August 29, 2013, the Company issued a press release. The press release

quoted then CEO, defendant Barnes, as stating: "Our earnings per share of $0.84 were at the

high-end of our guidance; excluding Ultra our earnings per share were $0.90."

21.     Also, on August 29, 2013, Signet filed its Form 10-Q with the SEC for the period

ending August 3, 2013, in which Signet represented:

> In March 2008, a group of private plaintiffs (the "Claimants") filed a class
> action lawsuit for an unspecified amount against Sterling Jewelers Inc.
> ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern
> District of New York alleging that US store-level employment practices are
> discriminatory as to compensation and promotional activities with respect to
> gender. In June 2008, the District Court referred the matter to private arbitration
> where the Claimants sought to proceed on a class-wide basis. In June 2009, the
> arbitrator ruled that the arbitration agreements allowed the Claimants to proceed
> on a class-wide basis and attempt to seek class certification. Sterling challenged
> the ruling and the District Court vacated the arbitrator's decision in July 2010.
> The Claimants appealed that order to the U.S. Court of Appeals for the Second
> Circuit. In July 2011, the Second Circuit reversed the District Court's decision
> and instructed the District Court to confirm the Arbitrator's Award (i.e., to allow
> the Claimants to move forward with a proposed class claim in arbitration).
> Sterling filed a petition for rehearing en banc of the Second Circuit panel's
> decision, which was denied on September 6, 2011. Sterling filed a petition writ of
> certiorari with U.S. Supreme Court seeking review of the Second Circuit's
> decision, which was denied on March 19, 2012. The arbitration proceeding has
> resumed. The parties engaged in fact discovery related to class certification issues
> through March 15, 2013. On June 21, 2013, pursuant to the briefing schedule
> ordered by the Arbitrator, the Claimants filed their motion for class certification,
> disclosed their experts, and produced their expert reports. Sterling's response to
> Claimants' class certification motion, Sterling's disclosure of its experts and their
> reports, as well as any motions relating thereto are due on October 3, 2013. The
> Claimants' reply brief, any expert rebuttal submissions, as well as any motions
> relating thereto are due on December 20, 2013. Expert discovery is ongoing, and
> all expert depositions must be completed by January 10, 2014. The parties have
> proposed that a hearing on Claimants' motion for class certification be held
> during the week of January 20, 2014, or as soon thereafter as the Arbitrator's
> schedule permits.

*       *       *

*Sterling denies the allegations* of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.

[Emphasis added].

22.     On November 26, 2013, Signet issued a press release announcing its third quarter fiscal 2014 financial results. The press release quoted defendant Barnes as stating that the Company was "pleased with" the results and that the Company's "competitive strengths have us well-positioned for the fourth quarter."

23.     On March 27, 2014, Signet issued a press release announcing its fourth quarter and fiscal 2014 financial results. The release quoted defendant Barnes as stating that the Company was "pleased with our progress in the current quarter-to-date and expect to achieve our goals for the first quarter" and that the "quarterly dividend demonstrates our belief in the strength of the business and our commitment to increase value for our shareholders."

24.     On March 27, 2014, Signet filed its Annual Report on Form 10-K with the SEC for the fiscal year ended February 1, 2014, and represented:

In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in U.S. District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in U.S. District Court for the Western District of New York. *Sterling denies the allegations* from both parties and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages. At this point, no outcome or amount of loss is able to be estimated.

\*       \*       \*

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in the U.S. District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional

activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis.

Discovery has been completed. The Claimants filed a motion for class certification and Sterling opposed the motion. A hearing on the class certification motion was held in late February 2014. The motion is now pending before the Arbitrator.

\*        \*        \*

**Sterling denies the allegations** of both parties and has been defending these cases vigorously. At this point, no outcome or amount of loss is able to be estimated.
[Emphasis added].

25.    On May 22, 2014, Signet issued a press release announcing its first quarter fiscal 2015 financial results. The release quoted defendant Barnes as stating in part:

While we expect to end the quarter with mid single digit comps, our performance in the second quarter to date has actually been higher than that including a strong Mother's Day. Our team's consistent ability to execute our initiatives by focusing on our competitive strengths leaves us well-positioned to achieve our objectives this year.

26.    On August 28, 2014, Signet issued a press release announcing its second quarter fiscal 2015 financial results. The release quoted defendant Barnes as stating that the Company "delivered a very strong second quarter" and "our best operating margin in five years."

27.    On October 14, 2014, Signet issued a press release announcing appointment of defendant Light as the Company's new CEO. The release stated in part:

Todd Stitzer, Chairman said "We are delighted to announce Mark's promotion to Chief Executive Officer of Signet. Mark is an experienced, strategic leader who has been deeply involved in the company's Vision 2020 Strategy, the Zale acquisition and its ongoing integration. ***In addition he has a meticulous approach to operational details, and has been the main architect of our Sterling division's consistently profitable growth and has played a key role in defining and executing Signet's growth strategy***. He has also been an advisor to our UK Managing Director since 2013 and became formally responsible for that business in mid-2014. ***These valuable attributes have been developed during his long and successful career of over 30 years with Signet, and the Board of Directors is***

*confident that Mark is the right person to lead the Company forward as Signet enhances its position as a leading retailer in the US, UK and Canada*."

[Emphasis added].

28.     On November 25, 2014, Signet issued a press release announcing its third quarter fiscal 2015 financial results. The release quoted defendant Light as stating: "The Sterling division delivered strong operating profit leading to adjusted earnings per share for Signet of $0.21, exceeding our guidance."

29.     On November 25, 2014, after releasing its third quarter fiscal 2015 financial results, Signet held a conference call for analysts, media representatives and investors, during which defendant Light represented the following: "We had a very successful and well-received managers leadership conference in the September/October time frame to kick off our fourth-quarter holiday preparations at the store level."

30.     On February 2, 2015, in the *Jock* private arbitration, Arbitrator Roberts granted, in part, the plaintiffs' motion for class certification. The arbitrator observed that sworn testimony included references to "soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected." Yet, "[f]or the most part Sterling has not sought to refute this evidence." Instead, "Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women." Accordingly, Sterling's public denials of the allegations in the arbitration in its SEC filings and other public statements were false or, at the very least, rendered misleading by its contrary submissions in the arbitration proceedings.

31.     On March 26, 2015, Signet issued a press release announcing its fourth quarter

and fiscal 2015 financial results. The release stated in pertinent part as follows:

> Mark Light , Chief Executive Officer of Signet, said, "We had an outstanding finish to another strong year of growth for Signet. . . . EPS of $2.84, and adjusted EPS of $3.06 – an increase of 40.4%. For the year, we generated . . . EPS of $4.75 and adjusted EPS of $5.63 – an increase of 23.5%.

*     *     *

> He continued, "I want to congratulate and thank all Signet team members for a fantastic fiscal year and fourth quarter. Their dedication, passion, and collaboration delivered significant value for Signet shareholders and position our Company for growth in the future."

32.   On March 26, 2015, Signet filed its Annual Report on Form 10-K with the SEC

for the fiscal year ended January 31, 2015, in which it represented:

> In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US District Court for the Western District of New York. ***Sterling denies the allegations*** from both parties and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages. At this point, no outcome or amount of loss is able to be estimated.

*     *     *

> As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("SJI"), a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. A hearing on the class certification motion was held in late February 2014. On February 2, 2015, the arbitrator issued a Class Determination Award in which she certified for a class-wide hearing Claimants' disparate impact declaratory and injunctive relief class claim under Title VII, with a class period of July 22, 2004 through date of trial for the Claimants' compensation claims and December 7, 2004 through date of trial for Claimants' promotion claims. The arbitrator otherwise denied Claimants' motion to certify a disparate treatment class alleged

10

under Title VII, denied a disparate impact monetary damages class alleged under Title VII, and denied an opt-out monetary damages class under the Equal Pay Act. On February 9, 2015, Claimants filed an Emergency Motion To Restrict Communications With The Certified Class And For Corrective Notice. SJI filed its opposition to Claimants' emergency motion on February 17, 2015, and a hearing was held on February 18, 2015. Claimants' motion was granted in part and denied in part in an order issued on March 16, 2015. Claimants filed a Motion for Reconsideration Regarding Title VII Claims for Disparate Treatment in Compensation on February 11, 2015. SJI filed its opposition to Claimants' Motion for Reconsideration on March 4, 2015. Claimants' reply was filed on March 16, 2015. No hearing has been scheduled. Claimants filed Claimants' Motion for Conditional Certification of Claimants' Equal Pay Act Claims and Authorization of Notice on March 6, 2015. SJI's opposition is due on May 1, 2015 and Claimants' reply is due on May 15, 2015. SJI filed with the US District Court for the Southern District of New York a Motion to Vacate the Arbitrator's Class Certification Award on March 3, 2015. Claimants' opposition is due on March 23, 2015 and SJI's reply is due April 3, 2015. SJI's motion is scheduled for hearing on April 20, 2015.

*      *      *

**SJI denies the allegations** of both parties and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

[Emphasis added].

33.    On May 28, 2015, Signet issued a press release announcing its first quarter fiscal 2016 financial results. The release stated in pertinent part as follows:

Mark Light, Chief Executive Officer of Signet, said, "We delivered a very strong first quarter . . . a 25.6% increase in adjusted EPS. . . .

"We continue to see favorable progress of our integration of the Zale division. . . . We expect this trend to continue, and we remain well-positioned to meet our goal of $150 million to $175 million in cumulative 3-year operating profit synergies by the end of January 2018."

"I want to congratulate and thank all Signet team members for their contributions to our impressive first quarter results."

34.    On August 27, 2015, Signet issued a press release announcing its second quarter fiscal 2016 financial results. The press release stated in pertinent part as follows:

Mark Light, Chief Executive Officer of Signet Jewelers, said, "Signet delivered a second quarter . . . earnings per share of $0.78, and adjusted earnings per share of $1.28, a 19.6% increase. These results exceeded our . . . adjusted EPS guidance for the quarter. Results were driven by strong and consistent sales growth across all of our selling channels, as well as solid profitability and disciplined cost management across our organization.

"The integration of Zale continues to go well, and we have begun to see the benefit of net synergies positively impact our operating results. I am increasingly confident that we are on track in FY16 to realize 20% of our three year net synergy target of $150 million to $175 million. . . .

"I want to congratulate and thank all Signet team members for their contributions to our quarterly results."

35.    On November 24, 2015, Signet issued a press release announcing its third quarter fiscal 2016 financial results. The press release stated in pertinent part as follows:

"Signet delivered another quarter of continued growth, highlighted by . . . adjusted earnings per share growth of 57.1%," commented Mark Light, Chief Executive Officer of Signet Jewelers. . . . "We also delivered excellent earnings growth, although earnings were affected by a modest margin impact due to a sales mix shift from Jared to Kay."

*       *       *

"The integration of Zale continues to go well, and we remain confident we will deliver $30 million to $35 million in net synergies this fiscal year. We remain committed to maintaining profitable growth while balancing investment back into the business with shareholder return.

"I want to thank all Signet team members for their contributions to our results and for their hard work in preparing for fourth quarter."

36.    On February 29, 2016, Signet issued a press release announcing its preliminary fourth quarter fiscal 2016 results. The press release stated in pertinent part as follows:

"Signet delivered outstanding fourth quarter results exceeding the high end of our adjusted EPS guidance with year-over-year growth of 18.6% . . . ," said Mark Light, Chief Executive Officer of Signet Jewelers. . . . "We are pleased with our first quarter to date operating results and continue to see strength in the business including credit. . . . After having operated Zales for a full year we have

identified a significant number of incremental synergy opportunities and are increasing our expectations for total synergies from $150 million - $175 million to $225 million - $250 million by the end of FY 2018 with a faster pace of synergy realization than previously guided."

Mr. Light continued, "Confidence in our business and the strength of our cash position enables us to maintain our capital allocation strategy that provides for meaningful returns to our shareholders. We see substantial value in our shares and our share repurchase program begins this week. Our team is doing an outstanding job of driving growth and delivering results."

37.     On March 24, 2016, Signet issued a press release announcing its fourth quarter and fiscal 2016 financial results. The press release quoted defendant Light as stating that "Signet had an excellent finish to another strong year with annual sales of $6.55 billion and comp sales growth of 4.1%." Defendant Light further stated in pertinent part:

"As we start our new fiscal year, we are pleased with our progress quarter to date as indicated by the financial guidance we have provided. In Fiscal 2017, we will continue our disciplined execution of our focused strategies that include our omni-channel approach to customer service; product innovation and fresh line extensions; and maximizing the effectiveness of marketing through the use of customer segmentation research. All of these efforts combined with an accelerated pace of store openings give us confidence in achieving another year of significant EPS growth, as evidenced by our newly-initiated annual guidance.

"I want to thank all Signet team members for their contributions to our results and for all their hard work in delivering the fourth quarter and Fiscal 2016."

38.     On March 24, 2016, Signet filed its Annual Report on Form 10-K with the SEC for the fiscal year ended January 30, 2016 and represented:

Signet is involved in legal proceedings incidental to its business. Litigation is inherently unpredictable. Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, require significant amounts of management time and result in the diversion of significant operational resources. In March 2008, private plaintiffs filed a class action lawsuit for an unspecified amount against Sterling Jewelers Inc. ("Sterling"), a subsidiary of Signet, in US District Court for the Southern District of New York, which has been referred to private arbitration. In September 2008, the US Equal Employment Opportunities Commission filed a lawsuit against Sterling in US

District Court for the Western District of New York. ***Sterling denies the allegations*** from both parties and has been defending these cases vigorously. If, however, it is unsuccessful in either defense, Sterling could be required to pay substantial damages. At this point, no outcome or amount of loss is able to be estimated.

*       *       *

As previously reported, in March 2008, a group of private plaintiffs (the "Claimants") filed a class action lawsuit for an unspecified amount against SJI, a subsidiary of Signet, in the US District Court for the Southern District of New York alleging that US store-level employment practices are discriminatory as to compensation and promotional activities with respect to gender. In June 2008, the District Court referred the matter to private arbitration where the Claimants sought to proceed on a class-wide basis. The Claimants filed a motion for class certification and SJI opposed the motion. A hearing on the class certification motion was held in late February 2014. On February 2, 2015, the arbitrator issued a Class Determination Award in which she certified for a class-wide hearing Claimants' disparate impact declaratory and injunctive relief class claim under Title VII, with a class period of July 22, 2004 through date of trial for the Claimants' compensation claims and December 7, 2004 through date of trial for Claimants' promotion claims. The arbitrator otherwise denied Claimants' motion to certify a disparate treatment class alleged under Title VII, denied a disparate impact monetary damages class alleged under Title VII, and denied an opt-out monetary damages class under the Equal Pay Act. On February 9, 2015, Claimants filed an Emergency Motion To Restrict Communications With The Certified Class And For Corrective Notice. SJI filed its opposition to Claimants' emergency motion on February 17, 2015, and a hearing was held on February 18, 2015. Claimants' motion was granted in part and denied in part in an order issued on March 16, 2015. Claimants filed a Motion for Reconsideration Regarding Title VII Claims for Disparate Treatment in Compensation on February 11, 2015. SJI filed its opposition to Claimants' Motion for Reconsideration on March 4, 2015. Claimants' reply was filed on March 16, 2015. Claimants' Motion was denied in an order issued April 27, 2015. Claimants filed Claimants' Motion for Conditional Certification of Claimants' Equal Pay Act Claims and Authorization of Notice on March 6, 2015. SJI's opposition was filed on May 1, 2015. Claimants filed their reply on June 5, 2015. Claimants' Motion was granted and the Arbitrator issued an Equal Pay Act Collective Action Conditional Certification Award and companion Order Regarding Claimants' Motion For Tolling Of EPA Limitations Period on February 29, 2016. SJI's deadline to move the US District Court for the Southern District of New York to vacate the Conditional Certification Award and Order Regarding Claimants' Motion For Tolling Of EPA Limitations Period is March 30, 2016. SJI filed with the US District Court for the Southern District of New York a Motion to Vacate the Arbitrator's Class Certification Award on March 3, 2015. Claimants' opposition was filed on March 23, 2015 and SJI's reply was filed on April 3, 2015. SJI's

motion was heard on May 4, 2015. On November 16, 2015, the US District Court for the Southern District of New York granted SJI's Motion to Vacate the Arbitrator's Class Certification Award in part and denied it in part. On November 25, 2015, SJI filed a Motion to Stay the AAA Proceedings while SJI appeals the decision of the US District Court for the Southern District of New York to the United States Court of Appeals for the Second Circuit. The Motion was denied on February 22, 2016. On December 9, 2015, SJI docketed its Notice of Appeal with the United States Court of Appeals for the Second Circuit. SJI's Brief and Appendix of Appellant was filed with the United States Court of Appeals for the Second Circuit on March 17, 2016. In the AAA proceeding, on April 6, 2015, Claimants filed Claimants' Motion for Clarification or in the Alternative Motion for Stay of the Effect of the Class Certification Award as to the Individual Intentional Discrimination Claims. SJI filed its opposition on May 12, 2015. Claimants' reply was filed on May 22, 2015. Claimants' motion was granted on June 15, 2015. On February 24, 2016, the Arbitrator also issued an Order granting Claimants' motion for a stay of the Class Determination Award or for equitable tolling of the statute of limitations with respect to the putative class of Claimants alleging disparate treatment.

*       *       *

**SJI denies the allegations** of the Claimants and EEOC and has been defending these cases vigorously. At this point, no outcome or possible loss or range of losses, if any, arising from the litigation is able to be estimated.

[Emphasis added].

39.     On May 26, 2016, Signet issued a press release announcing its first quarter fiscal 2017 financial results. The press release stated in pertinent part as follows:

Mark Light, Chief Executive Officer of Signet Jewelers said, "Signet delivered another period of solid performance resulting in record first quarter EPS and strong operating margin expansion. . . . Our 26% EPS growth was driven by higher same store sales and total sales along with solid expense management and synergies, leading to 190 basis points of operating margin expansion. In addition to delivering earnings results at the top end of our guided range, we achieved sales growth across real estate formats and in each of our divisions and our credit metrics showed strong sequential improvement.

Mr. Light added, "This Sunday marks the two-year anniversary of the close of our acquisition of Zale. The integration continues to go extremely well across all aspects of our business. The synergies we expect to deliver this year will be mostly driven by operating expense savings as a result of the sound investments and strategic management of the integration over the past couple of years. . . .

"I want to thank all Signet team members for their contributions to our results. Their superior experience and dedication is the key to our ability to deliver consistently solid performance in an ever-changing environment."

40.     On August 25, 2016, Signet issued a press release announcing its second quarter

fiscal 2017 financial results, which quoted defendant Light as stating in pertinent part as follows:

"Demonstrating our confidence in our company, we repurchased nearly four percent of our outstanding common stock during the quarter coupled with purchases by our Directors and Officers. As announced, and in a further demonstration of confidence in our company, LGP, one of the world's preeminent retail investors, agreed to purchase a $625 million stake in Signet. . . ."

Mr. Light concluded, "We have experience and success in navigating through the kind of uncertain business conditions we are seeing today. We are confident that our organization will do so again this year. . . . I want to thank all Signet team members for their dedication and hard work as we move in to the all-important holiday season."

41.     On November 22, 2016, Signet issued a press release announcing its third quarter

fiscal 2017 financial results. The press release quoted defendant Light as stating in pertinent part:

"Signet achieved some important wins during the quarter. Fashion diamond and gold jewelry performed well as did select branded bridal. We saw success in a variety of selling channels including kiosks, outlets, and on-line. In addition, our teams delivered solid expense and inventory management leading to strong free cash generation. The Zale integration is running well and synergies remain on target.

*        *        *

Mr. Light concluded, "Our competitive strengths, leading market position, and precedent of success support Signet's robust opportunities for long term growth. I want to thank all Signet team members for their dedication and hard work having delivered on the third quarter while preparing effectively for the fourth quarter."

42.     The statements contained in ¶¶ 20-41 were materially false and/or misleading

because they misrepresented and failed to disclose the following adverse facts pertaining to the

16

Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) approximately 250 former employees of Sterling Jewelers, Inc. ("Sterling"), a wholly owned subsidiary of Signet, claimed in sworn statements that Sterling executives presided over a corporate culture that fostered rampant sexual harassment and discrimination; (2) the current CEO of Signet, Defendant Mark Light, was among those accused of having sex with female employees and promoting women based upon how they responded to sexual demands; (3) it was unlikely that Signet would be able to avoid paying a sizable amount of damages in connection with the class action lawsuit filed by Sterling employees; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

43.     After trading closed on February 27, 2017, *The Washington Post* published an article entitled "Hundreds allege sex harassment, discrimination at Kay and Jared jewelry company," which stated in pertinent part:

> Hundreds of former employees of Sterling Jewelers, the multibillion-dollar conglomerate behind Jared the Galleria of Jewelry and Kay Jewelers, claim that its chief executive and other company leaders presided over a corporate culture that fostered rampant sexual harassment and discrimination, according to arbitration documents obtained by The Washington Post.

> Declarations from roughly 250 women and men who worked at Sterling, filed as part of a private class-action arbitration case, allege that female employees at the company throughout the late 1990s and 2000s were routinely groped, demeaned and urged to sexually cater to their bosses to stay employed. Sterling disputes the allegations.

> The arbitration was first filed in 2008 by more than a dozen women who accused the company of widespread gender discrimination. The class-action case, still unresolved, now includes 69,000 women who are current and former employees of Sterling, which operates about 1,500 stores across the country.

17

Most of the sworn statements were written years ago, but the employees' attorneys were only granted permission to release them publicly Sunday evening. One of the original women who brought the case, those lawyers said, died in 2014 as proceedings crawled on without resolution.

The statements allege that top male managers, some at the company's headquarters near Akron, Ohio, dispatched scouting parties to stores to find female employees they wanted to sleep with, laughed about women's bodies in the workplace, and pushed female subordinates into sex by pledging better jobs, higher pay or protection from punishment.

Though women made up a large part of Sterling's sales force, many said they felt they had little recourse with their mostly male management. Sanya Douglas, a Kay sales associate and manager in New York between 2003 and 2008, said a manager even had a saying for male leaders coaxing women into sexual favors to advance their careers, calling it "going to the big stage."

"If you didn't do what he wanted with him," she said in the 2012 sworn statement, "you wouldn't get your (preferred) store or raise."

*     *     *

The former and current employees are seeking punitive damages and years of back pay, though no estimate of the potential damages has been given. A class hearing, during which witnesses will be called to testify before the arbitration judge for the first time, is scheduled for early next year.

Sterling, like other U.S. companies, requires all workers to waive their right to bring any employment-related disputes against their employer in public courts.

Instead, complaints must be decided in arbitration – a private, quasi-legal system where cases are guaranteed little transparency.

Since 2015, The Post has requested to review the employee statements submitted as part of arbitration, all of which were designated as confidential. Employees' attorneys have also sought to make them publicly available. Attorneys for the employees and the company recently reached an agreement that the documents could be made public on the condition that they not identify any of the individuals to whom conduct was attributed.

More than 1,300 pages of sworn statements were released Sunday and feature company-approved redactions that obscure the names of managers and executives accused of harassment or abuse. But a memorandum by the employees' attorneys supporting their motion for class certification, filed in 2013,

revealed that top executives including Mark Light, now chief executive of Sterling's parent company, Signet Jewelers, were among those accused of having sex with female employees and promoting women based upon how they responded to sexual demands.

Light did not respond to requests for comment, and the company did not make him available for an interview. The company declined to address detailed questions about the allegations made by former employees against Light and other managers.

Many of the most striking allegations stem from the company's annual managers meetings, which former employees described as a boozy, no-spouses-allowed "sex-fest" where attendance was mandatory and women were aggressively pursued, grabbed and harassed.

Multiple witnesses told attorneys that they saw Light "being entertained" as he watched and joined nude and partially undressed female employees in a swimming pool, according to the 2013 memorandum.

Routine sexual "preying" at company events "was done out in the open and appeared to be encouraged, or at least condoned, by the company," Melissa Corey, a manager of Sterling stores in Massachusetts and Florida between 2002 and 2008, said in her declaration.

Ellen Contaldi, a Sterling manager in Massachusetts between 1994 and 2008, said in her declaration that male executives "prowled around the (resort) like dogs that were let out of their cage and there was no one to protect the female managers from them."

"I didn't like being alone, anywhere. I used to dread going" to the meetings, Contaldi told The Post in an interview. "If you were even remotely attractive or outgoing, which most salespeople are, you were meat, being shopped."

"It was like nobody knew right from wrong, and there was nobody trying to show anybody right from wrong," Contaldi added. "There was no discipline. There was no consequence. You were on your own."

Former employees who sought help or reported abuse through an internal hotline alleged in their declarations that they were verbally attacked or terminated. Kristin Henry, a five-year Sterling employee who said she was 22 when an older district manager tried to kiss and touch her at a managers event, told The Post she was falsely accused of theft and quickly fired after reporting his advances to superiors at Sterling.

The case, *Jock et al. v. Sterling Jewelers*, was filed before the American Arbitration Association, one of the nation's largest arbitration organizations. Kathleen A. Roberts, the case's arbitrator and a retired federal magistrate, is forbidden by association rules from speaking with the media. Like other arbitrations, the case before Roberts is conducted in private and is legally binding. While arbitrator decisions are appealable, there are very limited grounds on which decisions can be overturned. The confidential nature of the case has made it difficult to determine why it has taken so long to resolve.

In a 2015 decision to grant class-action status to the women, Roberts wrote that the testimony includes references to "soliciting sexual relations with women (sometimes as a quid pro quo for employment benefits), and creating an environment at often-mandatory Company events in which women are expected to undress publicly, accede to sexual overtures and refrain from complaining about the treatment to which they have been subjected."

"For the most part Sterling has not sought to refute this evidence," Roberts wrote. Instead, she wrote, "Sterling argues that it is inadmissible, irrelevant and insufficient to establish a corporate culture that demeans women."

The case could deeply tarnish a business that sells billions of dollars worth of jewelry a year through romance-centered marketing campaigns such as "Every Kiss Begins with Kay." Signet told shareholders in an annual report last year that it would have to "pay substantial damages" if it lost the case.

Sterling's mall outlets and storefronts account for a large chunk of America's jewelry market, as well as more than 18,000 jobs across all 50 states. Its parent company, Signet, which is domiciled in Bermuda but headquartered in Ohio, is the world's largest retailer of diamond jewelry, selling more than $6 billion of jewelry, watches and services in 2015, company filings show.

\*    \*    \*

Men who are not part of the class also filed sworn statements alleging Sterling was a hostile workplace for women. Richard Sumen, who worked for Sterling in Ohio from 1992 until 2005, said in his declaration that a group of managers and officers commonly known as the "good ole boys" was infamous for "protecting and promoting their friends, and wild escapades of sex, drugs, excessive drinking and womanizing." He recalled one former Ohio-based executive saying, "Why pay women more when they just get pregnant and have families?

\*    \*    \*

Sumen told The Post that he remained troubled by what he called Sterling's discriminatory corporate climate. He wrote in his 2008 declaration,

"This culture of sexism and womanizing was so prevalent that female management employees were pressured to acquiesce and participate."

**Like 'an abusive relationship'**

This culture seemingly arose in a company whose sales force was mostly women. More than 68 percent of Sterling's store managers are women, the company told The Post. Three of Signet's 10 executive officers are women. A job-recruitment video calls Sterling "your place to shine" and promises an "exciting and fulfilling career."

Light was made Sterling's chief executive in 2006 and presided over an eight-year growth streak during which the company's sales more than tripled. Light, now 54 and chief executive of Signet, earned about $7.4 million in salary, stock and bonuses in fiscal 2016, up from $2.4 million in 2014, company filings show.

\*          \*          \*

The Equal Employment Opportunity Commission said in a report last year that mandatory arbitration policies "can prevent employees from learning about similar concerns shared by others in their workplace."

44.     On this news, the Company's shares fell $9.29 per share or nearly 13% to close at $63.59 per share on February 28, 2017, damaging investors.

45.     On March 7, 2017, the *Financial Times* published an article entitled "Signet Jewelers is S&P 500's worst performer so far this year." According to the article, Signet's stock drop of nearly 13% on February 28, 2017, was "its biggest one-day drop in 8 years – after the Washington Post reported that former employees of Sterling Jewelers filed a private class-action arbitration case alleging discrimination, among other claims."

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Signet securities publicly traded on NYSE during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Signet, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Signet securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> a.     whether the Exchange Act was violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Signet;

c.      whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Defendants caused the Company to issue false and misleading SEC filings during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and SEC filing

f.      whether the prices of Signet's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53.      Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Signet securities met the requirements for listing, and were listed and actively traded on NYSE, a highly efficient and automated market;

b.      As a public issuer, the Company filed periodic public reports with the SEC and NYSE;

c.      The Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

54.      Based on the foregoing, the market for Signet securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.      Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>**COUNT I**</u>

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
<u>**Against All Defendants**</u>

56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.      During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Signet securities during the Class Period.

60.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Signet, their

control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

61.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company personnel to members of the investing public, including Plaintiff and the Class.

62.     As a result of the foregoing, the market price of Signet securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Signet securities during the Class Period in purchasing Signet securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

63.     Had Plaintiff and the other members of the Class been aware that the market price of Signet securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Signet securities at the artificially inflated prices that they did, or at all.

64.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

65.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Signet securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

66.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Signet's misstatement of revenue and profit and false financial statements.

68.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

69.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling

persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Signet securities.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by The Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 31, 2017                    Respectfully submitted,

                                             **STECKLER GRESHAM COCHRAN**

                                             /s/ R. Dean Gresham
                                             R. Dean Gresham
Texas Bar No. 24027215
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Rd, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com
Email: krogers@stecklerlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (not admitted)
Laurence M. Rosen, Esq. (not admitted)
275 Madison Avenue, 34th Floor
New York, NY  10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

**COUNSEL FOR PLAINTIFF**